COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPARTMENT
THE TRIAL COURT

NORFOLK, SS.:

| | | |
|---|---|---|
| JOHN B. DIRRANE, | ) | 99 00484 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. |
| | ) | |
| THE BROOKLINE POLICE | ) | |
| DEPARTMENT, Daniel C. O'Leary, | ) | Complaint |
| Individually and as Chief of Police, | ) | |
| THOMAS KEAVENEY, and | ) | |
| THOMAS HEAVEY, | ) | |
| Defendants. | ) | |

Introduction

1. John Dirrane, the plaintiff, was transferred out of the Detective Bureau of the Brookline Police Department and into the Uniformed Patrol Division in April of 1997. The Transfer of Officer Dirrane, confiscation of his firearm, confiscation of his keys to the office, and the attempted confiscation of voluminous documentation of police misconduct, and further subsequent substantial harassment and retaliations were a direct result of his reporting extensive Police misconduct and negligence to Captain Keaveney and Chief O'Leary on April 15, 1997, and his refusal to participate in unlawful coduct. Dirrane's complaints on this date were the last in a series of similar complaints beginning in 1992.

The Complaint states claims under the Civil Rights Act of 1964, G.L. ch. 12, Sec. 11I, and under the Massachusetts Whistleblower Protection Statute, G.L. c. 149, s. 185. He seeks compensatory damages, punitive damages, declaratory relief, attorney's fees and costs as against all defendants, and equitable relief against the Brookline Police

Department.

## Parties

2. The plaintiff, John Dirrane ("Dirrane"), is an adult resident of Massachusetts. At all times relevant to this action he has been employed by the Brookline Police Department.

3. The Brookline Police Department (the "Department") is an instrumentality of the Town of Brookline in Norfolk, Massachusetts.

4. The defendant, Daniel C. O'Leary ("O'Leary"), has been the Chief of Police of the Brookline Police Department at all times relevant to this action. He is named individually and in his official capacity.

5. The defendant Thomas Keaveney ("Keaveney"), has been the Detective Captain of Brookline Police Department at all times relevant to this action. He is named individually.

6. The defendant, Thomas Heavey has been a Sergeant and Supervisor of the Identification Bureau of the Brookline Police at all times relevant to this action. He is named individually.

## Facts

7. Dirrane has been a Brookline Police Officer since 1980 and was assigned to the Detective Division in 1986. His primary duties at times relevant to this action have been as a fingerprint and photography specialist for the Identification Bureau of the Brookline Police.

8. Dirrane was transferred out of the Detective Bureau and into the Uniformed Patrol Division in April of 1997.

2

9. The Transfer of Officer Dirrane was a direct result of his reporting extensive Police misconduct and negligence to Captain Keaveney and Chief O'Leary on April 15, 1997, his refusal to participate in the destruction of evidence, creating fraudulent police reports and his unwillingness to perjure himself..

10. Dirrane's complaints on this date were only the last in a series of similar complaints beginning in 1992.

11. The complaints brought by Dirrane to Captain Keaveney and Chief O'Leary on April 15th, included:

   a. The intentional destruction of physical evidence;

   b. The violation of numerous Brookline Police Department Rules and Regulations, Policies and Procedures, General Orders and Special Orders regarding the handling of Physical evidence;

   c. The filing of falsified Police Reports;

   d. The ordering of Dirrane to falsify Police Reports;

   e. The ordering of Dirrane to mislead prosecuting attorneys on issues related to his findings in criminal cases;

   f. The ordering of Dirrane to mislead defense attorneys on issues related to his findings in criminal cases;

   g. The ordering of Dirrane provide false and misleading testimony in criminal trials;

   h. The ordering of Dirrane not to have any communication with investigating Officers regarding the status of fingerprint investigations or the disposition of evidence; and

  i. The destruction or concealment of computer records related to fingerprint case records.

12. In the five years following Dirrane's assignment to the Identification Bureau there was a dramatic increase in the volume and complexity of evidence submitted for examination.

13. Initially, most of the fingerprint evidence submitted for examination would be in the form of fingerprint lifts. These lifts would then be logged in and simply transported to the State Police Crime Laboratory for further examination. If the evidence possessed sufficient detail and clarity, Sate Police personnel would photograph, enhance and search the resulting images in Automated Fingerprint Identification System ("A.F.I.S.").

14. If an identification was effected, the State Police would notify the Brookline Police of their findings, prepare written documentation and provide expert testimony during the resulting criminal proceeding.

15. During 1987 or 1988, all members of the Brookline Police Identification Bureau received training from the State Police in the preparation of latent fingerprints for A.F.I.S. searching. The training included instruction on fingerprint analysis, photography and the techniques and materials needed to submit fingerprint images to the State Police that were already prepared for A.F.I.S. entry. This preliminary preparation could reduce the time necessary to obtain search results from months or years to just several weeks. The Brookline Police Department adopted this as standard operating procedure.

16. During 1988 or 1989, The Brookline Police Identification Bureau, (Dirrane, MacIntyre and Heavey) received advanced training from the State Police in the final preparation of fingerprints for A.F.I.S. entry. This included the actual scanning, computer interpretation, search, initiation and result analysis. The Brookline Police Department adopted this protocol as the standard operating procedure.

17. The assumption of full responsibility for the searching of fingerprints in A.F.I.S. would dramatically shorten the interval between the submission of fingerprint evidence and the solution of Brookline crimes. It no longer took months or years to obtain results; a crime could now be solved within days and sometimes, within hours.

18. 1990 and 1991 saw a dramatic increase in the identification of latent fingerprints as well a substantial increase in the volume of evidence submitted for examination.

19. In 1989 approximately 70 fingerprint case were examined.

20. In 1991, the case volume had increased to over 150.

21. It was during this period that Heavey and MacIntyre demonstrated a reluctance or an inability to competently undertake latent fingerprint examinations. Their lack of involvement in the fingerprint caseload began to significantly effect the effectiveness of the Identification Bureau.

22. Also during this period, Heavey, MacIntyre and other members of the Brookline Police Department began a daily card game in the Bureau's photographic dark room.

23. Initially, the card playing lasted approximately one half hour, but eventually the game was lasting one and one half to two hours.

24. On weekends and holidays they played even longer. Their games of choice were PITCH or CRIBBAGE. Both games involved small stake gambling.

5

25. This activity took place with the full knowledge of the then Chief of Police Brackett and then Detective Captain Hayes.

26. Both Brackett and Hayes would often enter the darkroom while a card playing session was in progress, have conversation with a participant and leave without taking any action.

27. In 1992 the number of fingerprint cases submitted for examination exceeded two hundred.

28. Heavey's and MacIntyre's involvement in case examinations continued to be insubstantial

29. Dirrane's workload was extremely heavy.

30. All requests by Dirrane for assistance were met with indifference.

31. It was during 1992 that Dirrane was first encouraged to falsify reports regarding backlogged fingerprint cases.

32. The number of unexamined cases in storage was becoming a problem for Hayes and Heavey.

33. Investigators were looking for the results of the examinations and were making inquiries as to the status of the cases.

34. On several occasions, Hayes and Heavey instructed Dirrane to clear up various backlogged cases by reporting that no latent fingerprints had been developed on the evidence.

35. Dirrane would state that they had not been processed or examined and that any such report would be a fabrication.

36. Dirrane would be informed that if he didn't do it someone else would.

6

37. In spite of the deteriorating work condition, Dirrane had a remarkably successful year. The number cases solved through fingerprint identifications approached fifty.

38. During 1992, Dirrane began to suffer what would later be diagnosed as symptom of job stress. This included difficulty falling asleep, difficulty remaining asleep, chest pains, indigestion, headaches and exhaustion.

39. In December of 1992, Dirrane was named investigator of the year by his peers in the Brookline Detective Bureau.

40. During the party, Hayes Was accompanied by a friend, John Henry Williams.

41. Williams is the son of baseball legend Ted Williams and the Manager of Grand Slam Productions, a business that specialized in sports collectibles and memorabilia.

42. Also during the party, Hayes was displaying a large framed photograph of Ted Williams taken in his younger playing days. Hayes stated that Williams had given the photograph to him and that it was going to be personalized and autographed by Ted Williams.

43. Within days of the party, Hayes brought Williams to the Identification Bureau and stated that Williams was going to apply for a License to carry a concealed weapon.

44. Hayes instructed Dirrane that he was waiving the fees, investigation, range qualifying and that he wanted a license issued to Williams immediately.

45. Dirrane informed Hayes that he could not do that, that it violated virtually all of the firearms licensing rules. Hayes stated that he was not asking but ordering Dirrane to issue the license. Dirrane repeated that he would not comply with his order. Hayes threatened Dirrane with transfer in an outburst filled with profanities and stormed out of the Identification Bureau.

46. Hayes and Williams returned a short while later, met with Heavey and the license was issued. Additionally, Hayes instructed property Officer Carroll to escort Williams to AAA police supply and assist Williams in purchasing a weapon. This escort occurred while Carroll was on duty and used a Department vehicle.

47. In January of 1993, Chief Brackett instructed Dirrane to bring the Williams license file to his office. Once in the office Brackett asked Dirrane if proper procedures were followed during the issuing of the Williams license. Dirrane stated that Brackett should check with Hayes and Heavey, that they had issued the license.

48. Brackett stated that he wanted the information from Dirrane and that he didn't believe Hayes or Heavey would be truthful.

49. Dirrane related to Brackett all of the facts in the situation. Dirrane also related his outrage over the misconduct of Hayes in ordering the issuance of the license, especially after receiving a substantial gift from Williams.

50. Dirrane expressed concern that it would be obvious to Hayes and Heavey that he was the source of this information and that he feared further harassment. Brackett stated that he would concoct a cover story to insulate Dirrane and that he should be notified if Dirrane felt he was being targeted.

51. Brackett also sought information on the money handling and accounting practices used in the Identification Bureau. Dirrane related that there were virtually no accounting safeguards in place. He stated that thousands of dollars were collected from license fees, fingerprinting charges, range fees and photography charges every month. The only documentation was scribbles on the back of an envelope and that no legitimate receipts were issued. Dirrane informed Brackett that shortages were

8

common place and that funds were used for occasional lunches, retirement party tickets, flower funds and Christmas party tickets.

52. Brackett thanked Dirrane, told him that he had done the right thing and that he should not worry.

53. Within weeks of the meeting with Brackett, Dirrane was called by Hayes into is his office. Hayes told Dirrane that he was being transferred out of the Detective Bureau and back to the Patrol Division.

54. Hayes stated that " you're not a team player and I've had enough of your shit ".

55. In January of 1993, Dirrane coordinated the purchase of twenty new latent fingerprint recovery kits. Ten were used to replace the outdated kits used by members of the Detective Bureau. The remaining kits were to be assigned to patrol officers to address the need to recover latent fingerprint evidence when no Detectives were available.

56. Patrol print processing was primarily limited to crimes involving vehicles, i.e. breaking and entering of motor vehicles and larcenies of motor vehicles. The training and equipping of Patrol Officers was originally the idea of Patrol Captain Hiscock and was implemented by O'leary when he became Patrol Captain.

57. A general order was issued by Brackett providing that the solution of these crimes was a priority for the Brookline Police Department.

58. Officers were instructed that all such crimes should be examined for fingerprint evidence.

59. Dirrane trained 14 Patrol Officers in the necessary fingerprint recovery techniques.

60. There was an immediate increase in the number of motor vehicle cases submitted and a corresponding increase in the solution of these crimes.

61. Within months, many of the Officers trained by Dirrane, as well as several of their supervisors, reported that Heavey had informed them that the Identification Bureau did not except evidence from these minor crimes. They were also told by Heavey that they were not qualified to recover fingerprint evidence.

62. In February of 1993, the issue of the card playing finally came to light. While Dirrane was on vacation, a member of the Detective bureau complained to Hayes that the card playing was not appropriate.

63. This Detective stated that it was unfair to he and his partner and was impeding productivity in the Identification bureau. This Detective stated that he had talked to Dirrane about the card games and Dirrane had stated that it was a major problem.

64. In late February, a Detective meeting took place. In attendance were all members of the day Detective Bureau. In this meeting, Hayes proceeded to demean Dirrane and two other Detectives for repeating their displeasure with the card playing. The meeting deteriorated, with Hayes launching a barrage of insults against Dirrane and others. All of the complainants were ridiculed for not being team players and a bunch of troublemakers.

65. The meeting ended with the threat that if they didn't become team players they would all be transferred.

66. On May 25, 1993, Dirrane received an assignment from Hayes that he was to complete a fingerprint investigation that had been previously assigned to MacIntyre.

67. Hayes stated that MacIntyre was unable to handle the responsibility and that it was now Dirrane's case. The case involved evidence and fingerprints recovered from an armed home invasion that had occurred on April 5, 1993.

68. The case was rather complex and consisted of many latent fingerprints that had to be compared to 5 victims and 4 suspects.

69. Hayes instructed Dirrane that he was to complete the examination in four days. Dirrane spent the next two days organizing the evidence, latent fingerprints and fingerprint cards of the nine individuals involved. Dirrane's initial examination disclosed several major flaws in MacIntyre's original examination.

70. Dirrane informed Hayes that he would not be able to complete the examination by June first. Dirrane explained that this was due to the complex nature of this case and the inadequacies of MacIntyre's exam.

71. Hayes ordered Dirrane to file false reports stating that the exam was complete and that all remaining latent fingerprints were lacking sufficient detail for an identification.

72. Dirrane refused this order and stated that he would not falsify his findings or file a false report. Hayes became irate, and in a profanity filled tirade, stated to Dirrane that he was out of the Bureau and back in Patrol.

73. During the first week of June, Dirrane was called to a meeting in Brackett's office. During the meeting Hayes stated that he wanted Dirrane transferred out of the Detective Bureau. Hayes justified his request by claiming that Dirrane had refused several direct orders, failed to complete assignments in a timely manner and had disrupted the day to day operations of the Detective Bureau.

74. A short time later, Hayes came into the Identification Bureau office and instructed Dirrane that he had been transferred from the day identification shift to the evening shift. The transfer was effective June 7, 1993.

75. During the remainder of 1993 the number of cases submitted for fingerprint examination continued to increase. An increase was also noted in the number of cases in storage waiting for examination.

76. Heavey and MacIntyre continued to avoid case examinations. On the rare occasion that they did examine a case, the results were consistently negative. On virtually all cases examined by Heavey, no latent fingerprints of value were developed or the evidence was discarded unexamined, for MacIntyre the results were similar.

77. Occasionally MacIntyre would locate a latent fingerprint, but would be unable to complete the examination, A.F.I.S. preparation and search. Cases such as these would be reassigned to Dirrane for completion.

78. When Dirrane would begin an examination of a MacIntyre case, he would generally find many serious flaws in the prior exam. These flaws could include missing crime scene data, chain of custody data, missing or nonexistent case notes, no evidence photographs, substandard latent photography, missing lifts and missing evidence.

79. When Dirrane would attempt to resolve these errors by questioning MacIntyre, he would encounter hostility and denial.

80. When Dirrane would report MacIntyre's errors to Heavey, Dirrane would be instructed to fabricate the missing data or fraudulently justify the errors. In all cases, Dirrane would refuse any such orders from Heavey.

81. Dirrane stress related symptoms continued.

82. Dirrane was transferred back to the day shift to cover for summer vacations.

83. The computer database of fingerprint case records began to suffer from selective deletions. Files would routinely disappear from the database. In most instances the

deletions would involve open or unexamined cases. These were the only accurate source of data for a particular case and a loss would render any exam useless.

84. Dirrane began a systematic backup program that included password protecting an identical hard drive file and creating floppy disc backups.

85. On May 11th, 1994, Dirrane was instructed by Hayes to get rid of the backlogged cases by reporting that no latents had been developed. Dirrane stated that these cases had yet to be examined and that latents would likely be developed on most items. In another profanity-laden tirade, Hayes ordered Dirrane to falsify negative findings and file false reports related to the closing of these cases. Dirrane refused this order.

86. Hayes informed Dirrane that he would find someone who would follow his orders.

87. June 30th, 1994. Pursuant to Brackett's request, Dirrane provided a detailed analysis of the case statistics since the first of the year. Also provided were the case statistics for the same period of 1991, 1992 and 1993.

88. The statistics indicated that there had been a sharp decline in the volume of cases submitted and the number of crime solved by fingerprint analysis. Dirrane informed Brackett that the decline in the number of cases submitted was due to the frustration of investigators over the excessive time between submittal and examination assignment.

89. Dirrane attributed the reduction of identifications to his being prohibited from examining the evidence while it was still fresh and to improper evidence storage practices. Additionally, Dirrane informed Brackett this situation was the results of obstacles intentionally created by Heavey to discourage evidence submittal.

90. There were indications of breaches in chain of custody and evidence security in virtually every case that was assigned for examination. Upon initial receipt of evidence, Dirrane would inventory, photograph and seal the evidence in a bag or a box. When the case was assigned for examination the seals were often broken and in some case evidence was missing. There was no indication in the case record of any individual having examined or removed items. Complaints to Hayes and Heavey on this matter were met with total indifference.

91. On July 11th, MacIntyre refused a request, from a Patrol Officer, to conduct a crime scene examination. MacIntyre referred the call to Dirrane, who responded and processed the scene. While Dirrane was at the scene the Officer informed him of the refusal by MacIntyre. Dirrane made note of this fact in a private computer document.

92. On July 18th, Heavey had examined these computer files and located this document. Dirrane was informed by Heavey that he was going to be transferred back to the evening shift as soon as possible. Dirrane instructed by Heavey to remove all security measures from computer records.

93. On July 25th, Dirrane met with Hayes and was informed that he would be transferred to nights effective August 1.

94. On August 18, 1994, Dirrane met with then Detective Lieutenant Keaveney and discussed the unavailability of the A.F.I.S. during the evening shift. Dirrane stated that this fact would prevent most future fingerprint identifications.

95. Keaveney was also informed of the constant breaches in evidence security and the frequent loss of computer case data. Keaveney was supplied with recent computer logs demonstrating both issues.

96. On August 24th, Dirrane submitted a memo to Heavey on the same subject.

97. On September 29, 1994, Dirrane was called to a meeting with Hayes, Heavey and Keaveney. In this meeting Heavey stated that he was unsatisfied in Dirrane's work production. Hayes ordered Dirrane to submit a report documenting his weekly activity. Dirrane was to include in the report the time spent on each activity. No other Brookline Police department member was required to submit such a report.

98. Dirrane was also informed by Heavey that the Brookline Police Department would return to the practice of sending fingerprints to the State Police for searching.

99. Dirrane was only to complete the preliminary A.F.I.S. preparation; the State Police would handle the remainder of the analysis.

100. On October 3rd, Dirrane examined the latent log database and noted that lifts were now being submitted to the State Police with no Brookline Identification Bureau examination or preparation.

101. Dirrane noticed other disturbing facts. A person or persons unknown were entering the evidence storage locker and opening the containers that held fingerprint evidence.

102. There would often be items missing that were originally inventoried with no documentation as to who accessed the evidence. In other instances, the packaging showed evidence of being opened and evidence handled, also without documentation.

103. Evidence was being received by other Identification Bureau personnel who failed to enter the case in the computer log.

104. Someone was falsifying data on computer log entries. Entries were being made into the Dirrane's case records that were not his findings and were falsely attributed

15

to his work. In all cases this was to close a back logged case, dispose of evidence or cover for missing evidence.

105. Entire case records were often found to have been deleted from the computer system. These deletions had occurred since Dirrane had been ordered by Heavey to remove the security safeguards from the computer records.

106. Keaveney was notified of this misconduct and provided with computer printouts and documentation. Keaveney stated that he would look into Dirrane's claims and that he should be notified of any further problems.

107. Dirrane was notified that neither Heavey nor MacIntyre would provide confirmation of any latent fingerprint identifications. Proper protocol requires confirmations of all identifications by a second fingerprint. The State Police would handle all confirmations of any of Dirrane's identifications.

108. On November 23, 1994. Heavey related to Dirrane, a story of how when Heavey worked in the Traffic Division and a large parking ticket backlog created a problem, the traffic Captain stated that he would just dump the tickets. He was told that he couldn't do that. The Captain said, " we'll see ". When Heavey arrived for work the next day all of the tickets were gone. Heavey stated " that's what we need here".

109. On November 28, 1994. Dirrane found that the entire computer database latent log had been modified to display only the case numbers. Seven years of essential data had been deleted.

110. A check of a backup disc indicated that whoever had deleted the info had also backed up the files after deletions. This was not an accident, analysis of the paradox database program revealed that thirty-six keystrokes were needed to modify the file

format to its current condition. Computer Officer Wilder was called to the office and agreed with Dirrane's findings.

111. On December 1, 1994. Heavey stated that he had modified the files and that all the deleted data was unnecessary.

112. Heavey changed his story and said that the files were ok when he last viewed them. Heavey then stated that Andrea (informational services) had modified the files at his request and that she must have messed them up.

113. Dirrane provided copies of the deleted records to Keaveney and reported that he believed that Heavey had damaged the files intentionally. Dirrane informed Keaveney that when the records are restored it will be from an old back up disc and at least two months of data will be lost.

114. Dirrane further stated that Heavey would be more than pleased to destroy the accuracy of the records since evidence of his mismanagement and misconduct are present in the data. Dirrane related Heavey's traffic story to Keaveney and asked for an investigation of the matter.

115. The computer files had become too large to backup onto discs. Dirrane arranged to have a tape drive installed into the Identification computer. Other than the initial tape backup, all future tapes were purchased by Dirrane using personal funds.

116. On January 22, 1995. Dirrane met with Heavey and provided him with computer records that falsely attribute work findings to Dirrane.

117. Heavey stated that those old files were of no concern to him and have been disposed of. Heavey also stated that we would not accept any evidence from motor vehicle B&E's and larcenies.

118. On February 28, 1995. Dirrane was instructed by Heavey to contact the victim of a crime that involved missing evidence. Dirrane was told to inform the victim that the evidence had been processed, no latents were developed and the items were discarded. Dirrane refused. Heavey stated that the investigator would call.

119. On March 28, 1995, O'Leary was sworn in as new Brookline Chief of Police.

120. On June 12, 1995, Dirrane was instructed by Heavey to file a false report, mislead a United States Attorney and prepare to provide false testimony in a United States District Court trial. Dirrane refused Heavey's instructions.

121. Dirrane was then instructed by Heavey to inform the Assistant US Attorney that the Brookline Police Department did not want to participate in the trial. Dirrane also refused to follow those instructions. Heavey stated that he would handle the call to the attorney.

122. Dirrane went directly to O'Leary and related the instructions that he had received from Heavey. Dirrane informed O'leary that he was prepared to provide him with a report on what had occurred. O'Leary commended Dirrane for coming forward and told Dirrane that he would handle the complaint. No report was ever requested from Dirrane and no action was ever taken against Heavey.

123. On July 10, 1995. Dirrane was reassigned to days, to cover vacations.

124. On July 27, 1995 a latent case file appeared on Dirrane's desk . He asked Heavey about its origin, because it had never been logged as received by Identification.

125. Heavey stated that " I have a bunch locked up."

126. This revelation by Heavey confirmed Dirrane's suspicion that many cases were being submitted and not recorded.

127. Dirrane submitted a memo to Heavey requesting an accounting of all un-logged cases that he was holding. No response was ever received.

128. Dirrane was instructed by Heavey that he was to accept no evidence directly from the submitting Officer. That all evidence had to be submitted through the evidence lockers.

129. Dirrane asked that if an Officer came to the office with evidence to be examined that Dirrane could not accept it, but would instruct them that it had to be placed in the lockers that were ten feet away. Heavey stated that that was correct.

130. On August 24, 1995, Dirrane met with O'Leary at his request. The meeting lasted forty-five minutes and covered the full spectrum of Identification Bureau Problems; Falsified reports, mishandled evidence, evidence security, obstruction of evidence submittal and all related topics. O'Leary instructed Dirrane to be patient and he would address and correct these issues.

131. On September 7, 1995. Heavey instructed Dirrane that he was not to undertake any other duties except assigned fingerprint work. All requests from other Police Departments, from the Probation Department, any inked fingerprint examinations or any other identification work is to be handled by an intern.

132. Heavey also instructed Dirrane that he would dispose of all minor cases or any case for that matter in a manner that he see fit. Dirrane concurred that it he had the authority to do so, however, Dirrane requested that it be noted on the latent log who was responsible for the case closing and for the disposition of the property.

133. Heavey instructed Dirrane to close a case and dispose of evidence because it was a bad arrest and was dropped by the court. Dirrane had received contradictory

information from the court, and confirmed that it was an active case and the defendant was being held on bail.

134. The Assistant District Attorney stated that the case was very important and they were awaiting the fingerprint results.

135. On October 2, 1995. Dirrane attended a meeting with Keaveney, Heavey and MacIntyre. All of the usual topics discussed: Breaches in evidence security; false reports; undocumented cases; missing evidence; minor crimes etc.

136. Keaveney stated that we would continue to process all crimes and that he would not tolerate any continuation of the other issues.

137. October 25, 1995. Dirrane received a written order from Heavey that he would be required to submit a detailed daily work report specifying the time Dirrane spent on each examination. No other member of the department was required to submit such a report.

138. On October 30, 1995, Dirrane was instructed by Heavey to ignore a discovery motion in a criminal matter. Dirrane stated that it might jeopardize the case. Heavey replied " fuck em, it's a shit case anyway".

139. Dirrane stated that there was a request for fingerprint photographs and reports that would not take too long to complete. Heavey ordered Dirrane to call the ADA and inform him that they would take at least six months to complete, and that's only if nothing more important comes in. Dirrane refused Heavey's instructions.

140. On November 1, 1995. Dirrane met with Keaveney to discuss many Identification Bureau Issues. Dirrane was informed that no cases would be sent to the State Police