for examination. The Brookline Police Department will return to handling all of our own cases. Identification confirmations would also be handled in-house.

141.  Keaveney informed Dirrane that proper procedures would be required and that all members of the Identification Bureau would be held accountable. Keaveney stated that new cases would take priority and that Dirrane should come directly to him with any problems.

142.  Dirrane requested that Keaveney relieve him of the unfair daily reporting requirement instituted by Hayes and Heavey. That this reporting was harassment and that no other member of the Department was required to file this type of report. Keaveney stated that he would discuss it with Heavey.

143.  A Memo authored by Heavey was placed in daily "manifold" informing all Officers that elimination prints must be included with all evidence submitted for fingerprint examination.

144.  Heavey further writes that elimination prints are required by the State Police before they will conduct an A.F.I.S. search. Dirrane reports to Keaveney that this order is inaccurate and misleading and designed to inhibit evidence submittal.

145.  Dirrane stated the reasons for his disagreement with Heavey's order were as follows: The State Police do not require elimination prints; the State Police have no involvement with Brookline cases; officers recovering evidence do not have the ability to obtain elimination prints; and Heaveys order places the cart before the horse. The presence of latent fingerprints should be determined before elimination prints are requested.

146.    The new fingerprint evidence storage room was completed and all evidence

transferred from old locations. Keys to the new room were provided to Dirrane,

Heavey and MacIntyre. This new room could only be entered through the

Identification Bureau office. The walls didn't extend to the ceiling but the top portion

was secured with metal fencing. Dirrane could hear conversations and activities

carried on in the room from his desk.

147.    On November 14, 1995, Dirrane received a second discovery motion on a

criminal case (original received on October 30th ). Dirrane was instructed by Heavey

that the ADA was satisfied and that he was to make no effort to comply with motion.

148.    Heavey Instructed Dirrane to discontinue examination and dispose of case.

Dirrane felt that Heavey's instructions were not appropriate and should be brought to

Keaveney's attention.

149.    On November 15, 1995, on directions from Keaveney, Dirrane met with the ADA

and received a totally different story. The ADA was requesting a complete fingerprint

analysis and compliance with the discovery motion. Keaveney was informed of this

fact and authorized the examination.

150.    On November 26, 1995, Dirrane continued to encounter evidence that had been

opened and examined or handled without any documentation.

151.    On November 29, 1995 Dirrane continued to encounter evidence of records being

deleted from latent log database.

152.    On December 19, 1995. Dirrane met with Keaveney and reported the evidence

tampering and data deletions. Dirrane also discussed the effects that the workplace

hostility was having on him. Keaveney stated that he would address all issues in the near future.

153.    On December 26, 1995, Dirrane located additional records that indicated that evidence was being received by Heavey, not logged into and discarded.

154.    On December 28, 1995, Dirrane reported to Keaveney that evidence was being received by Heavey, not logged in and discarded. He also discussed the continuing unexplained opening of evidence containers. Keaveney stated that this would not be tolerated.

155.    On January 4, 1996, Dirrane reported missing evidence to Heavey. He was instructed to simply close case.

156.    On January 12, 1996, Dirrane was questioned by Keaveney on the status of new casework. Dirrane provided Keaveney with the assignments he had received from Heavey, which consisted of older cases. Keaveney became angry and instructed Dirrane that the priority was new cases only.

157.    In a separate meeting, Heavey stated that I was to work on old cases and that the new cases should be put on hold.

158.    On January 18, 1996 Dirrane received a call from the ADA in regards to an upcoming trial. The case would require additional processing and examination of a large quantity of evidence. Heavey was notified that the case required additional work.

159.    Heavey stated that Dirrane should report that there were no latents of value developed on the evidence. Dirrane informed Heavey that the evidence had not yet

been examined. Heavey stated they don't know that, just report that there was nothing found.

160.    Dirrane refused to mislead the District Attorneys Office. Keaveney was notified of Heavey's improper instructions and provided Dirrane with clearance to begin examination of evidence.

161.    On January 29, 1996, Dirrane was instructed by Heavey, that Keaveney did not want Dirrane running "out to A.F.I.S. all the time". This instruction was totally contrary to prior instructions from Keaveney.

162.    On February 9, 1996, Dirrane met with Keaveney to review assignments. Dirrane was instructed to keep up with new cases and conduct A.F.I.S. whenever necessary.

163.    On March 18, 1996, Dirrane received 4 latent lift cards from the State Police that had been submitted for examination. There were no records for either of these two Brookline cases. This was additional evidence that cases were being received and not logged in.

164.    During many of the 1995 and 1996 meetings, Keaveney informed Dirrane that he would be getting additional help in handling the fingerprint caseload and that Kaeveney would attempt to increase Dirrane's rate of compensation .

165.    On May 7, 1996, Dirrane began to receive case assignments from Heavey that authorized the examination of "lifts only". The processing of evidence was now becoming secondary to the examination of lifts. If a case contained both lifts and items to be processed, Heavey assigned the examination of the lifts and the evidence was left unexamined in storage.

166.    Dirrane met with O'Leary and requested that he be allowed to transfer to the evening shift. Dirrane explained that reason for this request was to allow Dirrane's wife to return to work after giving birth and to escape the oppressively hostile work atmosphere.

167.    O'Leary stated that Dirrane could work any schedule that he desired and that the evening shift was fine. O'leary asked if the problems had been corrected in the Identification Bureau. Dirrane stated that they had not been corrected and that the integrity of the unit was in jeopardy. O'leary stated that change takes time and that it was on his agenda.

168.    In May of 1996, Dirrane met with Keaveney, who stated that Dirrane would not be allowed to transfer to the evening shift. Keaveney required Dirrane's expertise during the day shift, Monday through Friday.

169.    Dirrane stated that if he worked the normal 8 AM to 4 PM shift it would be impossible for Dirrane's wife to return to work. Keaveney stated that Dirrane could work any hours he wanted as long as they were during the day.

170.    Dirrane asked if 6 AM to 2 PM was acceptable. Keaveney stated that it was. Dirrane stated that those hours had to be guaranteed because his wife had to bid for an appropriate shift.

171.    Keaveney stated that they were guaranteed.

172.    Dirrane asked if it was also permissible for him to travel from his home to the State Police laboratory and vise versa. Keaveney approved this type of travel.

173.    On June 11, 1996. Dirrane examined the computer records and determined that
        the data for at least one hundred open fingerprint cases had been deleted from the
        system.

174.    Dirrane generated copies of the deleted files and submitted all to Keaveney.
        Dirrane discussed with Keaveney the seriousness of these deletions. Dirrane stated
        that the objective of the deletions was obvious; to eliminate cases from the backlog
        without examination.

175.    On July 4, 1996, Dirrane attended a meeting with Keaveney and Heavey. Dirrane
        complained of the falsified latent log entries attributing activity to him. Several
        conflicting answers by Heavey: " I can find out who did the work "; and " no cases a
        actually assigned to anybody".

176.    The issues of flawed investigations by MacIntyre were addressed by Heavey. He
        said "fuck it, send them to the state".

177.    Dirrane then complained about the deleted case records. Heavey provided 4
        conflicting accounts; "they were deleted duplicates", "they were deleted because they
        are not needed", "they were deleted after they were backed up" and "I don't know
        what happened". Heavey comments then deteriorated into a series of profane insults
        directed to Dirrane. Heavey stated that Dirrane "was a fucking asshole who couldn't
        get along with anybody" that Heavey couldn't believe that Keaveney was letting this
        "asshole tell him what to do" and that Dirrane was just looking for overtime.

178.    Dirrane replied that he was not telling Keaveney what to do that he was simply
        informing Keaveney of serious problems that would eventually destroy the integrity
        of the Identification Bureau.

179.   The topic of missing evidence and chain of custody problems was also discussed.
Heavey denied that any such activity had occurred. Keaveney stated that he would
correct these problems.

180.   On July 23, 1996, the topic of the one hundred deleted fingerprint records again
became an issue. Dirrane had restored them to a password-protected file in
anticipation of an investigation by the department as to who had carried out the
deletions.

181.   Heavey instructed Dirrane to "get those fucking password files off the computer"
and " wasn't those fucking cases gone". Dirrane replied that those records contain
important data and they should be restored to the closed case database.

182.   Heavey replied that I want them all deleted. He asked Dirrane about the location
of his backup tapes and discs and instructed Dirrane to turn them all over to him.
Dirrane stated that they were his property and that he would retain control of all of
them.

183.   On numerous occasions Heavey and Keaveney would enter the case storage area
and examine evidence awaiting examination. Evidence bags and boxes would be
opened and evidence handled without proper precautions or documentation.

184.   In many cases evidence would be removed and discarded also without
documentation.

185.   Often Heavey would be accompanied by Keaveney during this activity.

186.   Dirrane directly observed these activities when he would be called into the room to
answer inquiries about a case or cases. Dirrane would also note that virtually all case

packaging that he had sealed upon placement in storage was found to have been violated when next examined.

187.  There was no need to open any of the packages due to a complete inventory that was attached to each case. Dirrane complained to Heavey and Keaveney about these breaches in evidence security.

188.  On September 30, 1996, Dirrane was called to meet with Keaveney. In the meeting Keaveney informed Dirrane that if the Identification problems didn't stop, he would transfer everybody back to patrol.

189. Dirrane asked in what areas he required improvement. Keaveney stated that he was doing an excellent job and that he was satisfied with Dirrane's work product. Keaveney then stated that the disputes and hostility had to end.

190.  Dirrane stated that he had tried to turn a blind eye to the activities of Heavey and MacIntyre but when these activities affected him, Dirrane felt it was his duty to act.

191.  On October 1, 1996, Dirrane met privately with Keaveney and requested that he examine the most serious issues; evidence security and computer file security. Keaveney stated that he would do just that. Keaveney instructed Dirrane to stop making waves.

192.  In January of 1997 Keaveney issued a Memo that evidence from minor crimeS would no longer be examined for fingerprints; that the closure of these cases will be cleared through him, and investigators will be notified of a case closure.

193.  Dirrane provided in service training for all department members in recognition and preservation of physical evidence. All training materials were cleared through Keaveney prior to their use in training.

194. On January 27, 1997, Dirrane noted that fifteen latent fingerprint cases had been closed without examination. Dirrane spoke to Keaveney who reported that Heavey had closed the "minor" cases with his approval. Keaveney stated that these cases had been in storage for a extended period of time and were unlikely to yield results.

195. Dirrane sought and received clearance from Keaveney to continue notifications of the investigating officers of the case closures.

196. On January 28, 1997. Heavey instructed Dirrane that he had begun to close minor and unexamined cases and that this process would continue in the future.

197. Dirrane requested that the Department establish in advance, which cases would be examined. This would eliminate wasted time by the investigators recovering the evidence and time spent in identifications initial exam. Heavey replied that he would decide on a case by case basis.

198. On January 31, 1997, Dirrane received a memo from Keaveney through Heavey, ordering him to cease notifications of investigators when case examinations are terminated.

199. Dirrane met with Keaveney who informed him that he was prohibited from providing any information, written or oral, to any member of the Department in regards to case closures or the case backlog.

200. In the same meeting with Keaveney, Dirrane was ordered to submit to an evaluation by the Department,s psychologist. Keaveney stated that Dirrane would be ordered to submit to the exam if he didn't volunteer to be examined.

201. Keaveney stated that a soon as the psychologist report was completed it would be made available to Dirrane, reviewed by O'Leary and used to make changes to reduce the stress level in the Identification Bureau.

202. Dirrane attended a series of meetings with a Dr. Seckler on February 4th and February 6th.

203. Keaveney assured Dirrane that the Psychologist's report would be provided to him as soon as it became available. Over the next two months Dirrane requested access to the report but was continually denied by the O'Leary and Keaveney.

204. Heavey and Keaveney continued to violate evidence security procedures by opening evidence packaging, handling evidence and discarding property without documentation.

205. Dirrane received conflicting orders from Keaveney and Heavey on an examination that had been conducted by MacIntyre. Keaveney had instructed Dirrane that he didn't have to complete MacIntyre's exam and Dirrane notified Heavey of this fact. Heavey insisted that Dirrane complete the exam.

206. Dirrane followed Keaveney's order in this matter.

207. Dirrane wasinstructed by Heavey that Keaveney didn't want him running to A.F.I.S. all the time. Dirrane stated to Heavey that he would comply and that he would no longer use his personal vehicle for any of these trips. Heavey also stated that he would terminate old and unexamined cases even if latents were present on the items. Dirrane stated that this fine as long as the work was not attributed to him.

208. Dirrane continued to request that he be provided with a copy of the Psychologist's report. The reply from Keaveney was "some other time" or "I'll ask the Chief"

209.  While Dirrane was in court on a Needham case, he received a page to call his Office. Dirrane made the call and spoke to Heavey who stated that Keaveney was changing his hours of work from 6 AM to 2 PM to 8 AM to 4 PM. Dirrane stated that he could not work that schedule due to a conflict with his wife's work hours. Heavey stated Dirrane's shift starts on April 15th at 8 AM.

210.  On April 15th, 1997 upon arrival at work, Dirrane examined the computer files and noted that an item of evidence that he had detected latents on, had been subsequently examined by MacIntyre who filed a report that there were no latents of value present.

211.  Additionally, the evidence had been wiped clean of all latent deposits, Dirrane had obtained photographs of the evidence, which showed the presence of latent impressions and retained them with the related computer documents.

212.  Dirrane then backed up all related computer files to tape and submitted a sealed copy to Evidence Officer Carroll.

213.  On April 15, 1997. Dirrane met with Keaveney and stated that he could not work these new hours due to a conflict in his wife's schedule. Keaveney stated that he was tired with Dirrane's behavior and that these hours not negotiable.

214.  Dirrane then asked for a transfer out of the Bureau.

215.  Keaveaney asked for the real reasons.  Dirrane then outlined all of the past unresolvedm and uninvestigated complaints: evidence tampering; evidence destruction; falsification of reports; promoting false testimony; destruction of vital computer records; negligence; incompetence; and indifference to prior reports of the same misconduct.

216.  Dirrane also presented the documentation from the case that had been wiped clean by MacIntyre.  Keaveney took notes of Dirrane's complaints and stated that these were serious charges and asked if Dirrane would repeat them to O'Leary.

217.  Dirrane agreed to not only repeat these charges to O'Leary, he stated that he would provide documentation

218.  On April 15, 1997, Dirrane and Keaveney then met with O'leary and the charges were repeated.  O'Leary asked Dirrane for documentation for these charges. Dirrane was able to provide several verbal examples of destruction of evidence and asked for time to prepare a full report and obtain necessary materials to support his claims.

219.  The Chief denied Dirrane's request for an opportunity to prepare a report of any kind. Dirrane was only able to provide a small group of deleted computer records.

220. MacIntyre was called to the meeting and offered that the evidence that he wiped down possessed no latent fingerprints.

221.  The Detective who originally recovered this evidence was also called in to the meeting and disputed MacIntyre's claim of no latents. This Detective stated that several latents were clearly visible.

222. Heavey was called into the meeting and Dirrane was instructed to repeat all of the charges. Heavey stated that none of what Dirrane was claiming had ever happened.

223.  O'Leary handed the limited documentation to Heavey and asked him to investigate Dirrane's charges and get back to him.

224.  O'Leary again denied Dirrane an opportunity to file a report with proper documentation to support his claim. A second meeting was scheduled for April 16, 1997.

225. On April 16, 1997, Dirrane was given a vacation day to handle a family emergency.

226. On April 17, 1997, Dirrane met with Keaveney and asked if he would be placed on administrative leave while these charges were investigated. Keaveney asked why would an administrative leave be justified. Dirrane stated that he was charging several Brookline Police Officers with serious misconduct and that there was a substantial likelihood of further harassment and intimidation.

227. Dirrane asked who would be conducting the investigation. Keaveney stated that the Brookline Department would conduct the investigation. Dirrane requested that an outside agency handle the investigation because many of the Officers who may be involved in an investigation could be biased or have some conflict of interest, including Keaveney.

228. Dirrane asked Keaveney what he should and where should he stay while waiting for a further meeting with O'Leary. Keaveney said that Dirrane should just sit at one of the desks in the Detective Bureau. Dirrane informed Keaveney that it would not be appropriate for any contact between himself and Heavey or MacIntrye.

229. Keaveney stated that there would be none.

230. Dirrane asked if Keaveney wanted him to empty out his desk in the Identification Bureau. Keaveney stated yes, but asked what personal property Dirrane kept in his desk.

231. Dirrane related that there were copies of all the investigations he was involved in during the eleven years in the Bureau, training materials he had accumulated and various other personal items. Dirrane also retained many documents that would be essential in substantiating his charges.

232.  Keaveney ordered Dirrane to allow him to view the contents of the desk and stated that all of the desk contents were Brookline Police Department Property and could not be removed by Dirrane.

233.  Dirrane protested and stated that this harassment had never occurred when other Officers were transferred and that any reports were simply copies and not the originals. Heavey was called over to the desk and affirmed Keaveney's opinion. Dirrane was ordered by Keaveney to lock the desk and the matter would be decided by O'Leary in the meeting scheduled later that day.

234.  On April 17, 1997. Dirrane returned to the empty Detective Bureau and was sitting at a desk when Heavey entered the office and demanded that Dirrane turn over the keys to his desk. Dirrane stated that Keaveney said O'Leary would decide the issue.

235.  Heavey stated that he was ordering Dirrane to turn over the keys to him immediately.

236.  Dirrane, fearing the destruction of incriminating documentation and the presence of a prior order from Keaveney, refused to comply with Heavey's order.

237.  Heavey became enraged, threatening Dirrane in an obscenity filled outburst that he was putting Dirrane up on charges for disobeying an order. Heavey continued that Dirrane was going to be suspended and that Heavey would see that he was dismissed from the force. Heavey ended the confrontation stating that he would have Dirrane's head when they all met with O'Leary later that day.

238.  During this dispute with Heavey, Dirrane experienced almost disabling stress symptoms. Dirrane's symptoms included tightness in his chest, a pounding and rapid pulse and extreme anxiety.

239. Dirrane felt that due to what appeared to be the changing nature of the situation (Dirrane now being the subject of a disciplinary action) that he should contact the Union President for advice. Dirrane related the basics of the story to Union President Seibolt who advised Dirrane to contact attorney Donna Buckley.

240. Dirrane contacted Buckley who stated that she could not be present to assist Dirrane during the meeting. Buckley advised Dirrane, that given his physical symptoms and emotional state, he should immediately report sick on duty and go home.

241. Dirrane related what had occurred to Detectives McHugh and Kelliher who also advised Dirrane to report sick. Dirrane gave McHugh the keys to his desk and asked that he submit them to the Steven Burke, the Internal Affairs Lieutenant. Dirrane left work and returned home.

242. Later on April 17, 1997, at approximately 5 PM, Dirrane was visited at his home by Detective Lieutenant Morgan and Internal Affairs Lieutenant Burke. Morgan and Burke stated that they had been ordered by O'Leary to confiscate Dirrane's keys to his desk, keys to the office, keys to the evidence room, keys to the computer and any other Brookline Police Department keys.

243. Morgan and Burke also ordered Dirrane to surrender his License to carry firearms, firearms identification card and all firearms that Dirrane possessed.

244. Dirrane complied with all requests. Morgan and Burke inquired what had occurred, and were informed by Dirrane that he had reported misconduct by Heavey and that he was immediately threatened by Heavey. Dirrane stated that due to this improper intimidation, he suffered from a severe anxiety attack and acting on the advise of an attorney, reported sick on duty.

245. Morgan and Burke stated that O'Leary was concerned for Dirrane's welfare and had ordered the confiscation of any firearms. Dirrane related that he felt this action was unnecessary and designed to direct attention away from the actual charges. Morgan and Burke left Dirrane's residence after informing him that he was ordered to attend a meeting with O'Leary on April 18, 1997. ( The Brookline Police Department made no attempt to contact Dirrane's wife and left Dirrane alone with his one-year-old daughter.)

246. On April 18, 1997. Dirrane met with O'Leary and Keaveney. In the meeting Dirrane was informed by Keaveney that he was being transferred because Dirrane had stated to Heavey that he was going to "work to rule" and that he had continued to cause trouble.

247. Dirrane asked Keaveney to specify what he meant by "work to rule". Keaveney stated that Dirrane had told Heavey that he would no longer use his private vehicle to travel to and from the State Police Laboratory and that Dirrane would only conduct A.F.I.S. searches when ordered to.

248. Dirrane informed Keaveney that those were specific instructions that he had received from Heavey. Keaveney stated that Dirrane was also being transferred due to due to Dirrane's continuing to cause trouble through his unsubstantiated charges of misconduct.

249. Dirrane stated that the only reason that his charges were unsubstantiated was that they had never been investigated. O'Leary stated that they had been fully investigated and that all of Dirrane's charges were untrue.

250.  Dirrane asked when the investigation had occurred and was informed by O'Leary that Heavey and Keaveney completed it on April 17th.

251.  Dirrane voiced the following objections to the investigative process: that no report had ever been requested from him; that Dirrane had not been interviewed; and that Heavey and Keaveney had a conflict of interest, and should not have been involved in the investigation. Dirrane also reported and that the complexity of the issues could not have been adequately investigated in twenty-four hours.

252.  Dirrane asked for a copy of the investigative report and was informed by O'Leary that no report existed. O'Leary stated that none of Dirrane's charges were true and that if Dirrane persisted with these complaints that his career would be in jeopardy.

253.  O'Leary stated that Heavey was outraged by these charges and may take action against Dirrane if they weren't withdrawn. O'Leary stated that Dirrane was suffering from burn out and job stress and had to think of his family, his new daughter, his new house and that this if this matter was closed quietly, there may be an opening for Dirrane in the day patrol division.

254.  It was clear to Dirrane that O'Leary was not going to initiate an investigation and was intimidating him to recant his complaints.

255.  Dirrane asked if the investigation was closed and was informed by O'Leary that it was.

256.  Dirrane asked O'Leary for a copy of the town Psychologists report and was again denied access. During the entire meeting Dirrane was suffering from almost disabling stress and anxiety and as the meeting ended Dirrane asked for, and was granted time off.

257. On April 28, 1997. Dirrane returned from leave and was assigned to inside duty in the Patrol Division as a call taker, computer operator and dispatcher.

258. The insults and ridicule from other Officers began immediately. Comments from other Officers such as Dirrane being assigned to "the rubber gun squad" or the "bow and arrow squad" deeply hurt and embarrassed Dirrane. Officers also informed Dirrane that they had been told he had been transferred due to a nervous breakdown.

259. Heavey returned the keys to Dirrane's desk and ordered him to clean it out. Dirrane met with O'Leary and was instructed to contact the Mass State Police employee assistance program and set up a meeting with one of their jog stress counselors. O'Leary stated that he could attend any of these meetings while he was working. Dirrane arranged a meeting with a Dick Walsh.

260. May 1ˢᵗ, 1997. Dirrane cleaned out his desk and returned the keys to Heavey.


261.. Dirrane met with Dick Walsh on May 7ᵗʰ, 1997, May 14ᵗʰ, 1997,

262. On May 16, 1997. Dirrane attended a meeting with O'Leary and Keaveney and was ordered to submit the original backup tape and any files that he had in his possession.

263. Dirrane stated that he would return the original backup tape, but that he should be entitled to retain copies of his investigative documents. Dirrane argued that any such records were his case notes and not official reports.

264. O'Leary stated that Dirrane was to return the original tape and that he could retain his notes. Dirrane then left the Brookline Police Station and met with the Town Psychologist Seckler.

265. On May 19, 1997. Dirrane was to submit all ordered computer files to McDermott who was unavailable at the time that Dirrane had to leave work to attend a scheduled appointment with Psychologist Seckler. Dirrane left the materials with property Officer Carroll with instructions to submit them to McDermott.

266. On May 20, 1997, Dirrane was presented with a document from Keaveney ordering him to explain in writing why he had failed submit materials to McDermott as ordered.

267. Dirrane was also ordered to explain why, upon his transfer from the Detective Bureau, he refused to turn over the keys to his desk to Heavey. This request was submitted to Dirrane by McDermott . Dirrane was being brought up on charges for disobeying direct orders.

268. On May 21, 1997. Dirrane had first appointment with his private psychologist.

269. On May 23, 1997, Dirrane met with Keaveney and Heavey who demanded that all reports held by Dirrane be turned over to them. Dirrane was instructed that he was to include all computer media and written documents. Dirrane repeated that all he possessed were copies of records already on possession of the Brookline Police Department.

270. On May 30, 1997, Dirrane met with O'Leary who informed him that after conferring with Dr. Seckler and the Towns Occupational Health Physician, Dr. Zimon, they felt it appropriate that he receive treatment for job stress. Dirrane was referred to Dr. Danforth of the Beth Israel Hospital Mind-Body Clinic.

271. Over the next several months Dirrane was seen and treated by Dr. Danforth on at least 4 occasions.

272. On June 11, 1997. Dirrane was informed by McDermott, that a criminal case involving one of Dirrane's identifications was approaching trial.

273. Dirrane informed McDermott that he would be able to provide a report on the original identification but would not be able to prepare the case for trial.

274. McDermott informed Dirrane that he would confer with Keaveney on this matter.

275. Dirrane met with Keaveney and Heavey over the issue of Dirrane's case notes and computer backup tapes. Dirrane was ordered to return to his home and retrieve an additional tape. Keaveney also informed Dirrane that he would be ordered to prepare the fingerprint case for trial.

276. Dirrane stated that he didn't believe that it was proper for him to complete the examination. Dirrane further stated that he was not sure that he could emotionally handle this assignment.

277. Keaveney stated that Dirrane would carry out the order or face the consequences. Dirrane restored all of his case notes for the last year into the Identification Bureau's computer.

278. On June 14, 1997, Dirrane began a review of restored computer records with Keaveney. Keaveney insisted that he be allowed to view private files present in some of the word processing directories.

279. Dirrane refused and asked to be allowed to consult with an attorney.

280. Over The next three months, Dirrane's job stress symptoms continued to get worse. Dirrane was receiving counseling. Also during this period there were numerous conflicts created by Dirrane's 'assignment to prepare a fingerprint case for trial.

281.  On July 9, 1997. Dirrane was informed by McDermott that he would be temporally re-assigned to identification duties to complete the fingerprint examination and to prepare the case for trial. Dirrane was further informed that at no time was he to be in the Identification Bureau unescorted by either Heavey or Wilder. Dirrane asked for the return of his computer files, which were necessary for trial preparation.

282.  On August 26, 1997. Dirrane was called to O'Leary's office and asked how everything was going. Dirrane informed O'Leary that he was suffering from ever-increasing stress due to his assignment to complete the fingerprint case. Dirrane repeated his request to be relieved from this assignment. O'Leary refused Dirrane's request.

283.  On September 13, 1997, after recent consultations with his Physician, Dirrane reported to the Brookline Police Department that he would be absent from duty due to a work related stress condition. Dirrane was instructed that a record would be made of this call but that he would have to repeat the report to Patrol Captain Mello on Monday, September 15th.

284.  On September 15, 1997. Dirrane spoke to Mello who instructed him to contact O'Leary. Dirrane repeated the reasons for his absence to O'Leary who stated that written documentation would be required from his Physician. Dirrane informed O'Leary that it would be provided as soon as possible.

285.  O'Leary then informed Dirrane that due to his unwillingness to follow an order to appear for a criminal matter that it appeared that a bench warrant would be issued for Dirrane's arrest and that he would be taken into custody by the State Police.

286. Dirrane requested time to consult with an attorney and with the A.D.A. involved in the case.

287. The A.D.A. informed Dirrane that she had been informed that he had a personality conflict with his coworkers and that was the reason for the problems in this case. Dirrane informed the A.D.A. that it was not a personal dispute, that it was over ethical issues that may cause a problem during the trial. The A.D.A felt that they could avoid these issues in trial.

288. Dirrane called O'Leary and informed that he would appear in court to represent the Brookline Police in this matter. Dirrane also advised O'Leary that this appearance was contrary to the advice of his physicians.

289. On June 24, 1998, Dirrane requested that Mello allow him to review his personnel files. At 10:30 am, Dirrane reviewed those files in Mello's presence. Dirrane's personnel files contained no materials newer than 1996.

290. In the files there was no mention of the events of the last two years. Dirrane asked Mello why the newer files were not included in his personnel file.

291. Mello stated that he had anticipated that Dirrane would be looking for those files and asked O'Leary for them.

292. O'Leary stated that he maintained a separate file on matters involving Dirrane and that Dirrane would have to meet with him for access to these documents. Dirrane asked Mello to inform O'Leary that he was requesting access as soon as possible. Mello stated that he would communicate Dirrane's request.

293. Later that day, Mello informed Dirrane that he had talked to O'Leary and that O'Leary would see you soon.

294. Dirrane met with Dr. Seckler and was examined to determine in Dirrane could have his firearm returned to him and assume full police duties.

295. On July 29, 1998. Dirrane qualified at the Boston Police firing range as proficient in the use of his service weapon.

296. On July 30, 1998, Dirrane's service weapon was returned to him by Mello.

297. Dirrane reminded Mello that he was still waiting for full access to his personnel records. Mello stated that he would remind O'Leary.

298. On August 11, 1998. Dirrane met with O'Leary who asked why Dirrane wanted to see him. Dirrane stated that he had reviewed his personnel files and found them to be incomplete. Dirrane stated that he was requesting copies of all personnel documents as defined by law. O'Leary asked why Dirrane wanted to see them. Dirrane stated that he was entitled to them.

299. O'Leary produced a report from Seckler dated May of 1997, and a second report from Seckler dated May of 1998.

300. Dirrane stated that there should also be a report from Seckler from his initial exam in February of 1997. O'Leary confirmed the existence of this report but stated that he couldn't find it.

301. Dirrane asked for a copy as soon as it was located.

302. Dirrane asked O'Leary for all of the reports and notes relating to Dirrane's charges of misconduct and any reports and notes relating to Dirrane's transfer out of the Detective Bureau.

303. O'Leary denied Dirrane's request and stated that all of those files were confidential.

304. Dirrane stated that he was entitled to full access to all reports, files and notes. O'Leary refused to allow access.

305. On August 23, 1998. Dirrane submitted a written request to view and copy his full and complete personnel records as defined by G.L. C. 149, section 52c as kept by the Town of Brookline and the Brookline Police Department.

306. On August 27, 1998. O'Leary confirmed receipt of the written request and informed Dirrane that he had received all that he was entitled to.

## COUNT I
### (G.L. ch. 12, Sec. 11I)

307. The Plaintiff repeats and realleges all prior Paragraphs as if fully set forth herein.

308. The individual defendants engaged in a joint venture to interfere by threats, intimidation and coercion, with the plaintiffs' rights secured under the constitution of the United States and the Constitution and laws of the Commonwealth to freedom of speech.

## COUNT II

### G.L. c. 149, Sec. 185
### (Massachusetts Whistleblower Protection Statute)

309. The Plaintiff repeats and realleges all prior Paragraphs as if fully set forth herein.

310. The defendant Department is an "employer" subject to the restrictions of the Massachusetts Whistleblower Protection Act , G.L. c. 149 s. 185.

311. The defendant Department has taken retaliatory actions against the plaintiff because Dirrane disclosed to a public body conduct he reasonably believed to be unlawful.

312.  Such retaliation by the Department against Dirrane violated his rights as protected

by c. 149 s. 185.

313. As a result of all the above conduct Dirrane has been injured. He has been

stigmatized.  His reputation has been damaged. His career has been ruined. He has

suffered great emotional distress.

COUNT III
42 U.S.C. s. 1983

314.  The Plaintiff repeats and realleges all prior Paragraphs as if fully set forth herein.

315.  All of the above acts were taken under color of state law.

316.  Defendants violated plaintiffs' rights to freedom of speech secured under the

constitution and laws of the United States and the Constitution and laws of the

Commonwealth.

COUNT IV
Civil Conspiracy

317.  The Plaintiff repeats and realleges all prior Paragraphs as if fully set forth herein.

318. The individual defendants acted in concert with or pursuant to a common design

with others, to commit tortious acts, namely, deprive plaintiff of due process of law.

319.  The plaintiff assert independently that the individuals gave substantial assistance to

or encouraged others conduct, knowing that such conduct constituted tortious acts, to

deprive plaintiff of due process of law.

WHEREFORE, plaintiff respectfully requests that this Honorable Court:

(1) Issue a declaratory judgment that the Department, and the other defendants

have acted unlawfully in retaliating against plaintiff, and in denying his rights

under G.L. C. 149,  section 52c;

45

(2)   Enter an Injunction restraining the defendants, and their agents, assistants, successors, employees, attorneys, and all persons acting in concert or cooperation with them or at their direction or under their control from further and future acts of harassment and retaliation against the plaintiff, for expression of protected speech;

(3) Enter judgment against the individual defendants under Counts I, III and IV, and against the Department under Count II, for damages and punitive damages in an amount to be determined by this Court, plus interest thereon;

(4)  Enter a judgment against the defendants for plaintiffs' costs, plus reasonable attorney's fees; and

(5) Grant such other and further relief as it deems just and proper.

A JURY TRIAL IS REQUESTED.

Dated this 25th day of March, 1999.

Respectfully submitted,

John B. Dirrane
By his attorney,

Eric S. Maxwell
BBO# 557787
112 Shawmut Avenue
Boston, MA 02118
(617) 357-5800

**Commonwealth of Massachusett**
NORFOLK SUPERIOR COURT
Case Summary
Criminal Docket

08/09/2004
08:33 AM

# NOCR1996-02164
## Commonwealth v Jones, David

| | | | |
|---|---|---|---|
| **File Date** | 09/04/1996 | **Status** | Disposed (disp) |
| **Status Date** | 10/21/1997 | **Session** | 1 - 1 - CtRm - Main |
| **Jury Trial** | Unknown | **Origin** | I - Indictment |
| **Lead Case** | | | |

| | | | |
|---|---|---|---|
| **Trial Deadline** | **Deadline Status** | **Status Date** | |
| | **Custody Status** | **Start Date** | |
| **Weapon** | **Substance** | **Prior Record** | Unknown |
| **Arraignment** | **PTC Deadline** | **Pro Se Defendant** | No |

### OFFENSES

| Num | Offense | Code | Status | Status Date |
|---|---|---|---|---|
| 1 | 06/26/1996 | 266/18/B | Guilty verdict | 09/22/1997 |
| | B&E DAYTIME FOR FELONY c266 s18 | | | |

### PARTIES

**Plaintiff**
Commonwealth
Gender: Unknown
Active 09/04/1996

**Defendant**
David  Jones
Gender: Unknown
Active 09/04/1996

**District Atty's Office 545920**
Robert C Cosgrove
Norfolk County District Atty's Office
45 Shawmut Rd
Canton, MA 02021
Phone: 781-830-4800
Fax: 781-830-4801
Active 05/11/2004 Notify

### ENTRIES

| Date | Paper | Text |
|---|---|---|
| 09/04/1996 | 1.0 | Indictment returned |
| 09/22/1997 | | RE Offense 1:Guilty verdict |
| 09/22/1997 | | Finding by Court: Verdict - Guilty . Bail revoked. Remanded to custody of Sheriff.Deft to be returned to Worcester H.C. until trial. Cont'd to 9/23/97.(Butler,J)(ct rpr. P.Rafferty) () |
| 10/08/1997 | | Continued until 10/21/97 for disposition, agreed.(Butler,J)(clerk. J.Uguccioni) |
| 10/21/1997 | | Finding by Court 10 yrs at MCI C.J. , nunc pro tunc to 9/22/97 & conc with sentence or sentences presently serving & purs. to jplea on 102279 as habitual criminal. Credit time V.W. fee. (Butler,J)clerk.J.Uguccioni)(ct rpr. D.Chapin) |
| 03/16/2004 | 90.0 | Motion by Deft: Motion to amend the renewed motion for a new trial based on newly discovered evidence.(c.s 1st crim. J.Dortch-O'Kara) |

**Commonwealth of Massachusett**
NORFOLK SUPERIOR COURT
Case Summary
Criminal Docket

# NOCR1996-02164
## Commonwealth v Jones, David

| Date | Paper | Text |
|------|-------|------|
| 03/24/2004 | 91.0 | Motion by Deft: Motion to correct the sentence. (c/s to st crim. J.Dortch'O'Kara) |
| 03/30/2004 | | 3/26/04: Motion (P#91) denied  This motion was fully addressed in a previous motion  for a corrected mittimus. The deft was given proper credit for time  awaiting trial.  That time was applied to his Worcester sentence.  He is seeking double credit. (Barbara A. Dortch-Okara, Regional Administrative Jusitce). Copies mailed |
| 03/30/2004 | | 3/29/04: Motion (P#90-Motion to amend the renewed motion for a new trial based on newley discovered evidende.- ) allowed Commonwealth to file any response to the "revewed motion for a new trial" within 60 days. (Barbara A. Dortch-Okara, Regional Administrative Jusitce). Copies mailed March 30, 2004 |
| 04/12/2004 | 92.0 | 4/1/04:  Motion by Commonwealth: Motion to vacate Court's order of March 29, 2004. |
| 05/04/2004 | | Motion (P#92) allowed (Dortch-O'Kara,  Associate Justice). Copies mailed May 11, 2004 |
| 05/14/2004 | 93.0 | Motion for Leave to Withdraw as Counsel (Chrystal Murray) |
| 06/02/2004 | 94.0 | 5/17/04: Withdrawal of appearance filed by Chrystal Murray |
| 06/02/2004 | 95.0 | 5/17/04: Deft files Renewed motion to amend the renewed moition for a new trial based on newly discovered evidence. |
| 06/15/2004 | 96.0 | Withdrawal of appearance filed by Chrystal Murray- Allowed.(Dortch-O'Kara,J) |
| 06/15/2004 | | 6/9/04: Motion (P#94) allowed (Dortch-O'Kara,J) |
| 06/15/2004 | | 6/90/04: Motion (P#94)Renewed motion to amend is  allowed . Atty Murray's motion to withdraw has been allowed and deft is now acting pro se.  The Comm shall file a response to "Renewed motion fo qa new trial within 60 days of this date.(Dortch-O'Kara,J) Copies mailed June 15, 2004 |
| 06/24/2004 | 97.0 | Commonwealth files Response to the Defendant's Amended Motion for a New Trial c/given to Judge Dortch-Okara |
| 07/01/2004 | 98.0 | ORDERED: On defts amended motion for a new trial- Denied. (Dortch-O'Kara,J) n/s |

**EVENTS**